Ulysses L. GREEN, Appellant,

v.

UNITED STATES, Appellee.

No. 97–CF–1580.

District of Columbia Court of Appeals.

Argued June 2, 1999.

Decided Oct. 28, 1999.

Gretchen Franklin, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Janice K. Myhand, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Elizabeth H. Danello, and Cynthia Walicki–Chan, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, STEADMAN and REID, Associate Judges.

STEADMAN, Associate Judge:

Before us is yet another appeal challenging the trial court's actions following an aborted jury poll. Appellant Green was charged with assault with a deadly weapon and possession of a firearm during a crime of violence. On the second day of deliberation, the jury foreperson reported a verdict of guilty on both counts. When polled, the eighth juror stated, "Disagree," whereupon the trial court discontinued the poll and instructed the jury to continue deliberations, using the language in the first paragraph of the standardized Criminal Jury Instructions for the District of Columbia (the "Red Book") No. 2.93, "Return of the Jury After Polling" (4th ed.1993). Appellant argues that this instruction, without more, was coercive because it did not remind jurors to remain true to their honest convictions. Under the circumstances presented in this case,

we find no abuse of discretion by the trial court and therefore affirm.[1]

## I.

Green was accused of having fired multiple gunshots at the apartment door of Floyd Borum. While no physical evidence tied Green to the scene, Floyd Borum identified Green as the perpetrator, and both Floyd and his brother Joseph gave testimony explaining the motive behind the assault. Floyd Borum stated he had purchased crack cocaine from Green on two occasions before a final transaction that led to a dispute between them. During this third and last transaction, Borum testified that he paid twenty dollars for what he presumed was crack cocaine. When Borum attempted to smoke the product he had purchased, he realized it was not crack and flushed it down the toilet.

Borum gave no further thought to the fraud, chalking it up to experience, until he encountered Green on the street two days later. He confronted Green with the fact that he was given something other than crack, whereupon Green stated that it must have been heroin and therefore the actual price was forty dollars. Green demanded payment of the additional twenty dollars, and Borum refused. The next evening, Green appeared at Borum's apartment. Borum again refused to pay additional money for a product he had not requested and told Green to leave. When Borum saw Green reach behind the small of his back and pull out a gun, Borum slammed the door and moved out of the way. He heard pounding, then shots, and then footsteps as Green presumably fled. Borum then woke his brother Joseph, told him of the events, and called 911 with the news that "somebody shot at my door" and police were needed.

Green's defense theory was that he was being framed by Borum who was angry about losing his twenty dollars in the bad drug deal (one characterized by Green as a sale of soap, not heroin, to Borum).

After three days of presentation of evidence and after closing arguments, the court instructed the jury on its duties, including an admonition not to be inappropriately swayed by the majority.[2] On the

1. Appellant also disputes an evidentiary ruling by the trial court permitting prior consistent statements on re-direct to rehabilitate a government witness. We review this claim for abuse of discretion, in light of appellant's argument that admissible consistent statements must have been made when "the witness did not have a motive to fabricate." *Prophet v. United States*, 602 A.2d 1087, 1093–94 (D.C.1992). *Accord, Tome v. United States*, 513 U.S. 150, 156–60, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995)(construing Fed. R. Ev. 801(d)(1)(B)). In the case at bar, Joseph Borum was asked on cross-examination why he had not initially told police officers about his run-ins with the defendant to which he was now testifying. The implication was that his story was fabricated to support his brother, the complainant. On redirect, the government elicited that Joseph Borum had ultimately shared his information with the police. His testimony on re-direct contradicted his earlier testimony with respect to the timing of his purported encounters with the defendant, and thus was not wholly a consistent statement. Furthermore, appellant had ample opportunity to point out the inconsistencies in Joseph Borum's testimony, and to note that his motive to lie existed at all times. Finally, any prior consistent statements were merely cumulative and were not critical to the case. Thus the error, if any, was harmless and presents no grounds for reversal. *McClellan v. United States*, 706 A.2d 542, 553 (D.C. 1997).

2. The pre-deliberation instruction was as follows:

It's your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to your individual judgment. To each of you, I would say that you must decide the case for yourself, but you should do so only after discussing it with your fellow jurors and you shouldn't hesitate to change your opinion when convinced it is in error. You shouldn't be influenced to voice—excuse me, you shouldn't be influenced to vote in any way on any question you are deciding just because the majority of jurors favor a particular decision or have an opinion different from yours. In other words, don't surrender your honest convictions about the effect

first day of deliberations, which began shortly before 1:00 p.m., the jury had not reached a verdict by 4:30 p.m. and was recessed for the evening.[3] The next morning at 10:55 a.m.,[4] the jury sent the court a note stating: "We are unable to reach an agreement, please advise." The court could not immediately reply because the defendant was not yet in the courtroom.[5] One hour and five minutes later, at noon, the jury indicated it had reached its verdict.[6] At 2:14 p.m., after the defendant arrived in the courtroom, the jury foreperson announced a guilty verdict on both counts.

Green requested a poll, which the court conducted by asking each juror whether he or she agreed or disagreed with the verdict as announced. The trial court cautioned the jury: "If you disagree in any way, simply say I disagree. Say nothing else. Again, it is not the time for explanations or comments. So if you agree with the two verdicts of guilty as I call your number, say I agree. If you disagree with the two verdicts of guilty in any way, simply say I disagree. Give no explanation or comment." The first seven jurors stated their agreement, but Juror Eight said, "Disagree." The court immediately excused the jury with an admonition to do nothing until further instructed.

The parties and the court then discussed alternatives. The defense first requested a mistrial, which was denied, and then requested that if an instruction was to be given that it be the "Gallagher" instruction, laid out as an alternative in the commentary to Red Book Instruction No. 2.91, entitled "When Jurors Cannot Agree."[7]

---

or weight of the evidence just to return a verdict or just because of the opinion of other jurors. But do reach a verdict if you can conscientiously do so.

The language of this instruction is very close to that of the second paragraph of Alternative A of the three "anti-deadlock" instructions set forth in Instruction No. 2.91 of the Red Book, discussed *infra*. The Red Book contains no comparable instruction suggested for use in pre-deliberation instructions.

3. The jury had sent the court a note, saying "We the jurors are at a stand still right now. May we recess for the rest of the evening?"

4. The record does not indicate at what time the jury began deliberating that morning.

5. The defendant's presence was required by Super. Ct.Crim. R. 43 and our case law. *See Smith v. United States*, 542 A.2d 823, 826 (D.C.1988).

6. The transcript does not specifically so state, but presumably the jury then went to lunch.

7. The Gallagher charge reads as follows:

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict should be unanimous.

You should consider that it is desirable that the case be decided if you can conscientiously do so; that you are selected in the same manner, and from the same source, from which any future jury must be; and

there is no reason to suppose that the case will ever be submitted to 12 persons more intelligent, more impartial, or more competent to decide it, or that more or clearer evidence will be produced on one side or the other.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without sacrificing your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views, and the reasons for your views, and to change your opinion if convinced it is wrong.

But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, only for the purpose of returning a verdict. You are not advocates for either side. You are judges—judges of the facts. Your sole interest is to find the truth from the evidence in the case.

This language comes from Judge Gallagher's concurrence in *Winters v. United States*, 317 A.2d 530 (D.C.1974), wherein this court dispensed with the use of the controversial *Allen* charge. *See infra*, note 16. The Gallagher language is a milder "anti-deadlock" charge than the language suggested by the *Winters* majority (the *"Winters"* charge), which appears as Alternative B in Instruction 2.91 of the Red Book.

The court determined that the more appropriate instruction was the first paragraph of Instruction No. 2.93, entitled "Return of the Jury After Polling."[8] It declined the defense's further request that the last sentence of the bracketed language in 2.93 be added to the proposed instruction to remind jurors to remain true to their honest convictions.[9] The court reasoned that the language was not necessary because the situation did not present unusual coercive circumstances different from a typical jury poll breakdown, and further noted that the jury had been reminded of its obligation to heed honest convictions before deliberations had begun.[10] Ultimately the instruction given to the jury was as follows, which was very close to the language contained in the first paragraph of Instruction 2.93, intended for use on "Return of the Jury After Polling":

> Ladies and gentlemen, in the polling of the jury that took place just then it became apparent that you had not actually reached a unanimous verdict in this case or unanimous verdicts. I don't know whether it's verdict or verdicts. For this reason, I'm going to be asking you to return to the jury room for further consideration of your verdicts in this case. If you are unanimous, your foreperson should send me a note so indicating and I will poll you again. If you are not unanimous, I would ask that you resume your deliberations and see if you can reach a unanimous verdict. With that you are excused back into the jury room to continue your deliberations.

Forty minutes later the jury returned another guilty verdict [11] which survived a renewed poll.

## II.

▆▆▆▆ The purpose of the jury poll was articulated a century ago by the Supreme Court in *Humphries v. District of Columbia*, 174 U.S. 190, 194, 19 S.Ct. 637, 43 L.Ed. 944 (1899): "Its object is to ascertain for a certainty that each of the jurors approves of the verdict as returned; that no one has been coerced or induced to sign a verdict to which he does not fully assent." In fact, "[t]he jury poll is the primary device for uncovering the doubt or confusion of individual jurors ... [and] has long been regarded as a useful and necessary device for preserving the defendant's right to a unanimous verdict." *Crowder v. United States, supra* note 9, 383 A.2d at 340 (internal citations omitted). Although no jury deliberations are devoid of ele-

---

8. The first paragraph of Instruction 2.93 reads as follows:

> In the polling of the jury it has become apparent that you may not have reached a unanimous verdict. For this reason, I am asking you to return to the jury room for further consideration of your verdict. If you are unanimous, your foreperson should so indicate and I will poll you again. If you are not unanimous, please resume deliberations and see if you can reach a unanimous verdict.

9. The bracketed language in Instruction 2.93 mirrors the language suggested by this court in *Crowder v. United States*, 383 A.2d 336 (D.C.1978), and reads as follows:

> It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself but do so only after an impartial consideration of the evidence with your fellow jurors.
> In the course of your deliberations do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

This is virtually identical to the language of the second paragraph of alternative A of Instruction 2.91, designed for use "When Jurors Cannot Agree."

10. *See supra*, note 2. As already noted, the pre-deliberation charge was in effect the same as alternative A and the virtually identical *Crowder* charge.

11. Before the jury returned to the courtroom to deliver the verdict, the court sent a note asking the foreperson to confirm that all jurors had agreed to the verdict.

ments of pressure, the unanimity requirement, which polling aims to preserve and ensure, does not constitute coercion in and of itself. *Harris v. United States,* 622 A.2d 697, 701 (D.C.1993). A court may legitimately seek to reach a conclusion on the merits, because to do otherwise "constitutes an unnecessary and undesirable waste of resources, and the trial court has a right and duty to urge a jury to work diligently to reach a fair and freely arrived at verdict if possible." *Id.* The delicate problem presented to the trial court is to balance this effort against improper court-induced or court-ignored jury coercion. *Benlamine v. United States,* 692 A.2d 1359, 1363 (D.C.1997)("reversal is required when it appears from the circumstances that a juror was forced into conforming to the majority's vote"); *Smith v. United States, supra* note 5, 542 A.2d at 824 ("Coercion of a jury verdict does not mean simple pressure to agree ... that pressure becomes coercive, however, when it goes so far as 'to force a juror to abandon his honest conviction'" (*quoting Winters v. United States, supra* note 7, 317 A.2d at 532)).

▆▆▆▆ "It is not the law, however, that impermissible coerciveness is demonstrated by the mere fact that the announcement by one juror seems to differ from the judgment of the other jurors." *Williams v. United States,* 136 U.S.App. D.C. 158, 164, 419 F.2d 740, 746 (1969). Hence, when a jury poll reveals a lack of unanimity, the court is governed by Super. Ct. Crim. R. 31(d), which allows either declaration of a mistrial or further deliberations

by the jury.[12] The trial court has considerable discretion in responding to a nonunanimous jury poll because it is best able to assess the impact of the dissenting vote and whether that juror ultimately gave its free consent to a subsequent verdict. *Benlamine v. United States, supra,* 692 A.2d at 1362–63.[13] Thus "even in the potential minefield of a jury poll, the trial court enjoys an appreciable measure of discretion." *Ellis v. United States,* 395 A.2d 404, 408 (D.C.1978).

▆▆▆▆ To require further deliberation after a breakdown in a poll, just as in response to an indication from the jury of a deadlock, is a court action "perfectly acceptable in appropriate circumstances when carried out with care. Indeed, [it is] part of the normal functioning of the jury system." *Harris v. United States, supra,* 622 A.2d at 701. To determine whether proceedings crossed the line into undue coercion and hence an abuse of trial court discretion, we look to the particular circumstances of each case. *Elliott v. United States,* 633 A.2d 27, 30 (D.C.1993). Further, we conduct our review of a claim of juror coercion from the "perspective of the jurors." *Benlamine, supra,* 692 A.2d at 1363. Our consideration of the issue involves generally inquiries into two areas: (1) the inherent coercive potential of the circumstances; and (2) any actions of the trial court which may have exacerbated or alleviated the coercive potential of the situation. *Davis v. United States,* 669 A.2d 680, 683 (D.C.1995); *Harris v. United States, supra,* 622 A.2d at 701.

---

**12.** The last sentence of the Rule, identical to its federal counterpart, reads: "If upon the poll there is not unanimous concurrence, the jury may be directed to return for further deliberations or may be discharged." Super. Ct.Crim. R. 31(d) (1998).

**13.** *See also Amos v. United States,* 496 F.2d 1269, 1273 (8th Cir.1974) ("Moreover, in evaluating the trial court's polling procedure, since the trial judge is present on the scene, we must pay due deference to his views on whether the recalcitrant juror's ultimate acquiescence came freely, without pressure

from the court."); *United States v. Brooks,* 137 U.S.App. D.C. 147, 150, 420 F.2d 1350, 1353 (1969)("Clearly, this provision invests the trial judge with a measure of discretion in assessing the impact of a dissenting vote during a jury poll, and the reasonable exercise of this discretion should be accorded proper deference by a reviewing court ... the trial judge is in a much better position than an appellate tribunal to determine whether a recalcitrant juror's eventual acquiescence in a verdict was in fact freely given.")

### III.

At bottom, the question in this appeal concerns the instructions that may be required when a jury is sent back for further deliberations after a jury poll reveals a lack of unanimity.[14] In addressing this issue, it may be useful to briefly summarize here the already adumbrated structure of the several instructions set forth in the Red Book, based on prior court decisions.

The Red Book instructions address separately two distinct situations that may face the trial court during jury deliberations. The first, Instruction 2.91, is headed "When Jurors Cannot Agree." It addresses what is commonly referred to as an apparently "hung jury," that is, a situation where the jury reports itself as "deadlocked," but where the trial court is of the view that further deliberation may in fact achieve a unanimous verdict. The Instruction presents three possible alternatives for an "anti-deadlock" instruction. Alternative A is based upon an anti-deadlock instruction developed by the American Bar Association in *Standards for Criminal Justice, Trial by Jury,* Standard 15–4.4 (2d ed.1980), in a version specifically approved in *United States v. Thomas,* 146 U.S.App. D.C. 101, 108 n. 46, 449 F.2d 1177, 1184 n. 46 (1971).[15] Alternative B was approved by this court sitting en banc in *Winters v. United States, supra* note 7, 317 A.2d at 534.[16] In *Winters,* we explicit-

**14.** Although appellant first asked for a mistrial, he does not challenge on appeal the propriety of sending the jury back for further deliberations, provided what he conceives of as required instructions were given.

**15.** Alternative A reads in full as follows:

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree to the verdict. In other words, your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case.

The charge suggested in *Crowder* consists of the second paragraph of Alternative A.

**16.** The text of the *Winters* charge is as follows:

In a large proportion of cases, absolute certainty cannot be attained or expected. Although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of the other jurors, yet you should examine the questions submitted to you with candor and with proper regard and deference to the opinions of each other. You should consider that it is desirable that the case be decided; that you are selected in the same manner, and from the same source, from which any future jury must be; and there is no reason to suppose that the case will ever be submitted to twelve persons more intelligent, more impartial, or more competent to decide it, or that more or clearer evidence will be produced on the one side or the other. And with this view, it is your duty to decide the case, if you can conscientiously do so. You should listen to each other's arguments with a disposition to be convinced. Thus, where there is disagreement, jurors for acquittal should consider whether their doubt is a reasonable one which makes no impression upon the minds of others, equally honest, equally intelligent with themselves, and who have heard the same evidence, with the same attention, with an equal desire to arrive at the truth, and under the sanction of the same oath. And on the other hand, jurors for conviction ought seriously to ask themselves whether they might not reasonably doubt the correctness of a judgment which is not concurred in by others with whom they are associated; and distrust the weight or sufficiency of that evidence which fails to carry conviction in the minds of their fellows.

In *Winters,* the court modified the powerful anti-deadlock language known as the *Allen* charge. The *Allen* charge was anti-deadlock language that specifically directed the minority, whether it be a minority for conviction or acquittal, to reconsider its position without a

ly stated: "We are only setting the high water mark for an anti-deadlock charge. Use of a less emphatic charge ... may be deemed appropriate, either in the original charge or after deadlock becomes apparent." *Winters v. United States, supra* note 7, 317 A.2d at 534. Finally, the comments to Instruction 2.91 present what is, in effect, an alternative C, the so-called Gallagher charge. This is based on Judge Gallagher's concurring opinion in *Winters* and has been sanctioned as an alternative instruction in the discretion of the trial court. *Epperson v. United States, supra* note 16.[17] In terms of emphatic effect, we have said that *Winters* is the high water mark, followed by the Gallagher charge and then alternative A. *Epperson v. United States, supra* note 16, 471 A.2d at 1017 n. 2.[18]

The problem of a deadlocked or "hung" jury, however, is not necessarily the same as a jury that, in polling, simply reveals a split. An anti-deadlock charge in the federal system, sometimes referred to generically as a "dynamite charge," is addressed as a separate instruction from an after-poll

charge.[19] The District's Red Book does likewise. It is Instruction 2.93 that addresses itself to "Return of the Jury After Polling." The "standard" charge in 2.93 is a single paragraph, which, although perhaps capable of more sinister interpretations, appears on its face to be a simple and straightforward instruction to go back and deliberate further.[20] It reads:

> In the polling of the jury it has become apparent that you may not have reached a unanimous verdict. For this reason, I am asking you to return to the jury room for further consideration of your verdict. If you are unanimous, your foreperson should so indicate and I will poll you again. If you are not unanimous, please resume deliberations and see if you can reach a unanimous verdict.

This was the instruction that the trial court chose to give following the aborted poll here. *See supra* text accompanying notes 8–10.

Instruction 2.93 then contains two additional paragraphs in brackets. These

---

comparable directive to the majority. That charge, derived from *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), has since fallen out of favor in nearly all jurisdictions because of the consensus that it is too coercive of minority voters. *Epperson v. United States,* 495 A.2d 1170, 1173 (D.C. 1985)(on rehearing).

**17.** The text of the Gallagher charge is set forth in note 7, *supra.*

**18.** In the rehearing of the *Epperson* case, 495 A.2d 1170, we treated all three alternatives as "anti-deadlock" charges for purposes of determining whether Alternative A could be followed by a *Winters* charge within the meaning of the doctrine prohibiting two anti-deadlock charges as unduly coercive. However, Alternative A is plainly the mildest of the three, and insofar as its central element has been approved for reinstruction to a non-unanimous polled jury in *Crowder,* we have subsequently characterized it as an instruction with significant potential and intent to alleviate coercion. *Harris v. United States, supra,* 622 A.2d at 705. In *Harris,* the trial court fashioned a reinstruction in which it included the "coercion reducing elements" of

the *Crowder* instruction. *Id.* at 706–07 & n. 20.

**19.** FEDERAL JURY PRACTICE AND INSTRUCTIONS addresses dynamite charges in § 20.08, "Supplemental Instructions—When Jurors Fail to Agree Seasonably." HON. EDWARD J. DEVITT ET AL., FEDERAL JURY PRACTICE AND INSTRUCTIONS, § 20.08 at 853 (4th ed.1992). In the same volume, § 20.09, "Return to Deliberations After Polling," sets forth a typical instruction similar to the District's Instruction 2.93 and notes variations used in different jurisdictions. *Id.* at 888.

**20.** Over the years the Red Book has modified Instruction 2.93 to soften its potential to isolate dissenting jurors. In particular, prior to 1978, the first sentence read: "In the poling of the jury, one of your members made an answer which indicates that you may not have reached a unanimous verdict." The language was then modified to its current version: "In the polling of the jury it has become apparent that *you may not* have reached a unanimous verdict." The 1978 revisors explained the change as follows: "This instruction modifies instruction 2.93 in the 1972 Edition by changing the first sentence to avoid focusing the jury's attention upon a dissenting juror."

paragraphs constitute the instruction suggested in *Crowder* for possible use in a case where the jury is sent back after an aborted poll. The Comment to the instructions makes it clear, however, that in the view of the Red Book compilers, this is not intended for routine use in such situations. To the contrary, the Commentary states: "Paragraph one of this instruction is intended for use where a poll of the jury reveals lack of unanimity in the verdict and the court determines that further deliberations are appropriate.... The last two bracketed paragraphs are not ordinarily required, but they have been recommended by the Court of Appeals for use in cases where there is a particularly high likelihood of juror coercion." From the instruction and its commentary emerges a baseline assumption that at least some, if not the majority, of poll breakdowns do not indicate such a high potential for undue coercion that additional instruction is required.[21] We think this assumption is correct and that the situation presented to the trial court here was not one where any additional instruction was mandated on pain of reversal. We turn to that issue.

### IV.

### A.

We evaluate the facts of this case in light of the two-part framework first set forth in *Harris v. United States*, discussed earlier. We look first to the coercive potential inherent in the situation. The identity of at least one dissenter was revealed in open court, and thus both the judge and jurors were aware that the court had some knowledge of individual juror positions. However, in terms of the degree of isolation of the dissenting juror, the poll was terminated the moment the eighth juror's position was revealed, and the juror was not interrogated, questioned, or otherwise singled out. The juror gave no indication as to the reason for the answer, "Disagree."[22] Though it appeared that the eighth juror represented at least a minority position on one count, and perhaps was a lone holdout, *see Davis v. United States*, *supra*, 669 A.2d at 684, four other jurors had not stated their votes aloud. This was not a situation in which the court knew the exact numerical division of the jury, nor was it a situation where the split did not reveal itself until the twelfth juror spoke, thus identifying that juror clearly as the sole obstacle to unanimity as in *Crowder* and *Harris*.

Furthermore, this was not a case where the trial court already was facing a deadlocked jury. No anti-deadlock instruction had been given after the jury's first note requesting advice. While Green highlights this note as an indication that the jury had

21. There is no national consensus in the courts on the most appropriate instruction for a return to deliberation after a jury poll. Some jurisdictions have made short embellishments to minimize the chance that an instruction will seem too directive. For example, the Sixth Circuit includes a final sentence as follows: "Talk to each other, and make every reasonable effort you can to reach unanimous agreement, if you can do so honestly and in good conscience." Pattern Criminal Jury Instructions of the District Judges Association of the Sixth Circuit, Instruction No. 9.05 (1991). Others, such as the Eighth Circuit, are instead far more terse than our own jurisdiction: "The poll of the jury shows that there is not a unanimous verdict. Please return to the jury room and continue your deliberations." Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit, Instruction No. 10.03 (1992). Still others include a full anti-deadlock charge. *See, e.g.*, Federal Criminal Jury Instructions of the Seventh Circuit, Instruction No. 7.07 (1980); Manual of Model Criminal Jury Instructions for the Ninth Circuit, Instruction No. 7.06 (1992).

22. It is possible the eighth juror was merely confused about some aspect of the verdict, and did not feel the pressure of being a dissenter in the face of majority opposition. This is in significant contrast to the situation in *Crowder*, where the juror had identified his concern as "lack of evidence." In *Crowder*, we mentioned this "degree of assurance with which this single juror dissented" as one of the two reasons for reversal. 383 A.2d at 343.

been deadlocked and left without guidance, thus enhancing coercive potential, we disagree with this characterization. The jury note did not state that it was "hopelessly deadlocked," but simply, "We are unable to reach an agreement. Please advise." The jury had not been deliberating for any considerable period of time or with any marked indication of inability to eventually agree on a verdict. As already noted, even the degree of uncertainty of the eighth juror was veiled in this case due to the careful instructions of the trial judge as to how a juror should respond in the polling.[23]

We think it therefore reasonable to view the situation facing the trial court as somewhat of a run-of-the-mill polling breakdown. "A juror's change of mind during a poll of the verdict is not unusual." *Lumpkin v. United States*, 586 A.2d 701, 705 n. 4 (D.C.1991). While there were to be sure indications of greater jury difficulty in reaching a verdict than would be true in the cleanest of cases, we do not think that the coercive potential here was that markedly different from most other situations where a juror in the polling process indicates that the jury has not yet reached unanimity.

Therefore, the issue really becomes whether in such circumstances the law mandates that some sort of instruction in addition to that provided in the first paragraph of Instruction 2.93 must be given, or whether it is proper for the trial court to simply send the jury back for further deliberation without further comment. We see no basis here to fault the trial court for its essentially neutral course of action.

Appellant mischaracterizes the instruction given by the court as insisting that the jury reach unanimity. In fact, the instruction is far more neutral, asking the jury only to "see if you can reach a unanimous verdict." An exhortation to the jury to

continue deliberating, without more, has never been held by this court to approach an anti-deadlock instruction. *Carey v. United States*, 647 A.2d 56, 60 (D.C.1994) (instruction to "deliberate further ... and continue to give this case your best efforts" not anti-deadlock charge); *Lumpkin v. United States, supra*, 586 A.2d at 703–06 (instruction twice to resume deliberations "without comment" after first juror dissented in poll not plain error); *Coleman v. United States*, 515 A.2d 439, 452–53 (D.C.1986)(two instructions to "continue deliberating" were not anti-deadlock instructions precluding the giving of an actual anti-deadlock charge later on); *Wilson v. United States*, 419 A.2d 353, 355–56 (D.C.1980) ("please continue" not an anti-deadlock charge); *Calaway v. United States*, 408 A.2d 1220, 1229–30 (D.C.1979) ("please keep trying" not plain error anti-deadlock language).

■ Indeed, our recent cases indicate the care that a trial court must exercise in expanding its instructions to a jury in an aborted poll situation, and in particular giving an instruction which may be construed as anti-deadlock in nature. Recently in both *Davis v. United States, supra*, and *Benlamine v. United States, supra*, we have reversed convictions where a trial court, after learning through a jury poll of the existence of a minority for acquittal, subsequently gave the anti-deadlock *Winters* charge. While in such a situation it presumably cannot be an abuse of discretion to give the far milder *Crowder* charge contained in the two optional paragraphs of Instruction 2.93, with its recognized coercion-reducing elements, *see Benlamine v. United States, supra*, 692 A.2d at 1361; *Harris v. United States, supra*, 622 A.2d at 707, a trial court may properly take into account its anti-deadlock origins (discussed *supra*) in deciding on another course of

---

**23.** The government notes that appellant was being tried on two counts, and it was possible that the juror's disagreement was only to one of the guilty verdicts. *Cf. Harris, supra*. Ap-

pellant argues with some force, however, that the intertwined nature of the two counts here made such a possibility slim at best.

action, namely, silence, in ordinary circumstances.

We also take particular note of the fact that in this case, the trial court had, in its initial instructions, effectively given the *Crowder* instruction with its language on remaining faithful to a juror's honest convictions. *Cf. Epperson v. United States, supra,* 495 A.2d at 1173. This is not a case, then, where the jury was left entirely on its own in the face of a split, and the trial court here noted that what the defendant was essentially seeking was reinstruction. We have often said that jurors are presumed to follow instructions, *Knight v. Georgetown Univ.,* 725 A.2d 472, 483 (D.C. 1999), and that decisions on reinstruction are left to the broad discretion of the trial court. *Graham v. United States,* 703 A.2d 825, 832 (D.C.1997).

### B.

In an attempt to provide an alternative to a *per se* rule mandating use of the full text of 2.93, appellant argues that this case is akin to *Crowder* and its progeny, lifting it out of the average jury poll breakdown case. *Crowder* was the case in which we suggested that cautionary language might be used beyond a neutral request to continue deliberations in the face of a split jury. In that case, a jury poll revealed the last juror to be the single dissenter. That twelfth juror not only expressed his disagreement with the guilty verdict announced by the foreperson, but announced that his dissent was based on "lack of evidence," further isolating him from his juror colleagues. *Crowder, supra* note 9, 383 A.2d at 340. While we generally endorsed the language of Instruction 2.93 in that opinion, *id.* at 342 n. 11, we held that a mistrial was mandated, at least without some additional instruction. *Id.* at 342. The holding was based on "(1) the inevitable increase in potential coerciveness which occurs when both the numerical division of the jury and the identity of the lone dissenter are revealed in open court, and (2) the degree of assurance with which the

single juror dissented." *Id.* at 343. We went on to suggest the additional instruction, discussed above, that we said might have dispelled some of the coercive effect on the dissenter and potentially saved the case from the fate of a mistrial. *Id.* at 342 n. 11. We stressed, however, that we were ruling only "*on the facts of this case.*" *Id.* (emphasis in original). The case now before us, as already indicated, differs from *Crowder* in marked respects.

Since *Crowder* was decided in 1978, we have reversed two convictions returned after juries broke down during a poll. In both cases, the jury was returned for further deliberations, indicated they remained deadlocked after these additional deliberations, and the court responded with a *Winters* instruction. We concluded each time that the *Winters* instruction put too much targeted pressure on the revealed minority juror or jurors, and determined the court had created undue coercion, thus abusing its discretion. *Davis v. United States, supra,* 669 A.2d at 684 (*Winters* instruction to combat a deadlock note after earlier jury poll had revealed a dissenter " 'may be interpreted by the minority as an implied command to agree with the majority' " and therefore was error (quoting *Smith v. United States, supra* note 5, 542 A.2d at 824)); *Benlamine v. United States, supra,* (after a poll breakdown, where a jury returned one unanimous verdict but reported a deadlock on another count, a *Winters* instruction to reach unanimity on the remaining count was coercive because minority had been revealed).

We have also upheld two convictions returned after a jury poll breakdown in the years subsequent to *Crowder.* In *Harris, supra,* superficially similar to *Crowder,* the dissenting vote came from the twelfth juror, who stated he agreed only with part of the verdict. The judge immediately stopped the poll and asked the jury to continue its deliberations, without adding *Crowder* cautionary language. 622 A.2d at 699. Shortly thereafter, the jury submitted a note indicating that they were unable

to reach unanimity. Because the court saw the possibility of a partial verdict, it elected to send the jury home for the evening, stating that it would respond to their note the following morning. The next day, the court proceeded with a *Crowder*-like instruction, containing its coercion-reducing elements. *Id.* at 707 n. 20.[24] Subsequently the jury returned a verdict that survived a poll. Because the *Harris* judge "did not give an 'anti-deadlock' instruction nor did he single the dissenting juror out in any way," we found that the court did nothing to exacerbate and indeed alleviated a potentially coercive situation. *Id.* at 706. As such, there was no abuse of discretion.

In *Elliott, supra,* after the seventh juror expressed dissent in a poll, the court instructed with the first paragraph of 2.93, which at that time included the following additional language: "After you return to the jury room any member is free to change his or her vote on any issue submitted to you. Each juror is free to change his or her vote until the jury is discharged."[25] 633 A.2d at 31. The court refused the defense's request, made the following morning, to further instruct with language assuring the jury that a verdict was not mandatory.[26] We ruled the instruction was neutral and the verdict fairly and freely reached. *Id.* at 36. Among other things, we found a primary distinction between *Elliott* and *Crowder* in that it

was not the twelfth juror who expressed dissent. *Id.* at 37 n. 18.[27]

Taking into account the factual circumstances already discussed, we conclude the case at bar is closer to *Harris* and especially *Elliott* than to those cases in which a *Winters* instruction was given to a jury that had demonstrated a split with an identified minority position. We see no reason to conclude here that the jury was "coerced into conforming to the majority's vote" or that it did not "freely and fairly arrive[ ] at a unanimous verdict." *Harris v. United States, supra,* 622 A.2d at 701 (quoting *Smith v. United States, supra* ).

*Affirmed.*

---

24. Although based on *Crowder,* the instruction actually given was far from a verbatim version. 622 A.2d at 700.

25. Since that time, this last sentence has been struck from the instruction, and the *Crowder* language added as an optional supplement. If anything, the stricken language would appear to be more impelling toward a unanimous verdict than simply saying nothing on the point.

26. Appellant argues that the failure to ask that this language be included in the original instruction reduces *Elliott* to a plain error case. We think this understates the thrust of the opinion.

27. Likewise we noted in *Harris* that "less inherent coercive potential would be found if the dissenting juror were earlier in line because the precise numerical division of the jury would not be revealed; the juror would not necessarily be the only dissenter and the poll could be terminated without requiring the remaining jurors to commit themselves in open court. In such a case, a trial court would have more leeway to handle the situation without abusing its discretion." 622 A.2d at 703. This is not to ignore the reality that even where the dissenting juror is the third one polled, "we can safely infer that a minority of the jurors (and likely only one juror) were (or was) initially not in favor of the guilty verdict." *Davis, supra,* 669 A.2d at 684.