*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CF-512

VICTOR COLEY, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED **11/15/2018**
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CF3-19633-13)

(Hon. Michael Ryan, Trial Judge)

(Argued March 16, 2017                    Decided November 15, 2018)

*Deborah A. Persico* for appellant.

*Patricia A. Heffernan*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino*, *David Misler*, and *Jeffrey Nestler*, Assistant United States Attorneys, were on the brief, for appellee.

*Daniel Gonen*, with whom *Samia Fam* and *Stefanie Schneider* were on the brief, for the Public Defender Service, *amicus curiae*, in support of appellant.

Before GLICKMAN, FISHER, and THOMPSON, *Associate Judges*.

GLICKMAN, *Associate Judge*:  After a jury trial, Victor Coley was convicted

on multiple counts of assault with intent to kill while armed, aggravated assault

while armed, and related firearms offenses. His principal contention on appeal, and the only one we find it necessary to address, is that the trial judge erred by failing to respond appropriately when a breakdown in the jury poll and a subsequent note from a juror revealed a substantial possibility that the juror felt coerced into surrendering her honest convictions and rendering a guilty verdict. We agree that Mr. Coley is entitled to a new trial on this ground.

**I.**

The charges against appellant arose from an incident on November 6, 2013, in which a lone gunman fired shots into a crowd of people gathered outside a Payless store in the 3900 block of Minnesota Avenue, N.E. At trial, the government presented evidence that the gunman was appellant. Appellant's defense was misidentification; he presented evidence that the shooter was someone else. Because the issue we address in this appeal arose out of the jury's deliberations, it is unnecessary to recite the evidence in detail.

In his charge to the jury at the conclusion of the trial, the judge informed the jury that if it needed to communicate with the court, it could send a note, signed by the foreperson or one or more jurors, through the court clerk or the marshal. The judge cautioned the jury not to reveal its numerical division with regard to

conviction or acquittal. He explained that the jury's "mission" was "to reach a fair and just verdict based on the evidence"; that "[a] verdict must represent the considered judgment of each juror"; and that "[i]n order to return a verdict, each juror must agree on the verdict," i.e., its verdict "must be unanimous." There was no instruction to the effect that a juror should not surrender honestly held convictions to achieve unanimity.

The jurors began their deliberations on Friday afternoon, February 20, 2015. At 12:05 p.m. on Tuesday, the court received a note, signed by the foreperson, stating the jury had "reached a decision on all counts." In the courtroom, the foreperson announced that the jury unanimously found appellant guilty of all the charges against him.

The judge proceeded to poll the jury, asking each juror individually, "Do you agree with the verdicts as stated by your foreperson?" The first two jurors answered "yes." But when the third, Juror 668, was asked whether she agreed with the verdicts, she responded, "I can't" (or, possibly, "I can't agree").[1] The judge

---

[1] The transcript states that Juror 668's response was "inaudible" to the court reporter. The judge initially stated that he heard "I can't agree" but then accepted the prosecutor's corrective statement that "she just said 'I can't.'"

immediately stopped the poll and sent the jurors back to the jury room with instructions to refrain from discussing the case while he consulted with the parties.

In the jury's absence, the judge discussed with counsel how to proceed. Appellant moved for a mistrial, which the judge denied. Defense counsel argued that requiring further deliberations would create a high likelihood that Juror 668 would be coerced into changing her vote because her response to the poll indicated she almost certainly was the sole dissenter from the verdict announced by the foreperson. The judge disagreed. He found that Juror 668's "I can't" was ambiguous and did not necessarily mean she dissented from the declared verdict; rather, the judge observed, the juror simply may have been "confused," or she may have felt unable to "say that he's guilty even though the evidence supports it."[2] In addition, the judge deemed it "speculation" to conclude that Juror 668 was the only juror not joining in the announced verdict, inasmuch as she was only the third juror polled and the "exact numerical division" of the entire jury with respect to the verdict was unknown; this was not, the judge said, "the sort of situation where it's the 12th person who is polled, who's the only person that says no." Moreover, the

---

[2] The judge recognized that he had discretion to question the juror further in an attempt to resolve the ambiguity but was reluctant to do so lest the questioning become coercive.

judge noted that the jury had been deliberating for only "about a day and a half on about five full days of evidence," which was "a short period of time" in the judge's estimation.

For these reasons, the judge concluded that the "evidence" did not show "a particularly high likelihood of juror coercion" if he recalled the jury to the courtroom and instructed it to continue its deliberations. For the language of that instruction, the judge looked to Instruction 2.603 ("Return of the Jury After Polling") in the "Redbook."[3] In accordance with the first paragraph of that instruction, the judge instructed the recalled jurors as follows:

> [I]n the poll of the jury, it's become apparent that you may not have reached a unanimous verdict. Now, for this reason I'm going to ask you to return to the jury room for further consideration of your verdict. If you are unanimous your foreperson should send me a note indicating that, and I will poll you again. If you are not unanimous please resume deliberations and see if you can reach [a] unanimous verdict.

Instruction 2.603 contains two additional, bracketed paragraphs cautioning jurors that, while they should be willing to reexamine their views, they should "not surrender [their] honest conviction[s] as to the weight or effect of evidence solely

---

[3] Criminal Jury Instructions for the District of Columbia (5th ed. 2015).

because of the opinion of [their] fellow jurors or for the mere purpose of returning a verdict."[4]  In considering whether to include these bracketed paragraphs in his directions to the jury, the judge noted that the comment to Instruction 2.603 explains that the paragraphs "are not ordinarily required" but had been recommended by the Court of Appeals in *Crowder v. United States*[5] "for use in cases where there is a particularly high likelihood of juror coercion."[6]  Because the

---

[4] The two bracketed paragraphs read in their entirety as follows:

> It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment.  Each of you must decide the case for yourself but do so only after an impartial consideration of the evidence with your fellow jurors.

> In the course of your deliberations do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous.  But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

[5] 383 A.2d 336, 342 n.11 (D.C. 1978) (explaining that such an instruction is designed to "allay" the fear that a "lone recalcitrant juror will conclude that the trial judge is requiring further deliberations in order to eliminate his dissent").

[6] Instruction 2.603 cmt.

judge perceived no such likelihood, he chose not to give the bracketed *Crowder* instruction.[7]

The judge excused the jury at 1:00 p.m., asking it to deliberate until 1:30 p.m. before taking a lunch break. At 1:25 p.m., the judge called the parties back to the courtroom to advise them of a new development – the clerk had informed him of a jury note. The judge explained that he had not seen the note and did not know what it said because the clerk had taken it directly to another judge (Judge Canan) for review, "which is her responsibility when a note might evidence . . . a split or something like that in the jury." At Judge Canan's suggestion, the judge excused the jurors for lunch until 2:30 and instructed them not to discuss the case. The prosecutor inquired, "what do we do with that note or do we speak with Judge Canan, what's the next move?" The judge answered that he needed to talk to Judge Canan to "figure out . . . the outline of the situation before I can tell you all what to do."

After a recess, the court reconvened at 2:30 p.m. The judge reported to the parties that he had conferred with Judge Canan. Their discussion was off the

---

[7] Appellant did not request the *Crowder* instruction at this time. The prosecutor agreed that it was unnecessary.

record, but the judge advised the parties that Judge Canan had confirmed that the note contained information he should not see and had suggested he remind the jury not to reveal its voting split under any circumstances.[8] The judge stated that he intended to follow that suggestion and also tell the jury that he had not read the note, that he did not know who sent it, and that the jury should resume its deliberations. Appellant objected and asked for a mistrial or, if that was denied, for the judge to include the bracketed paragraphs of Instruction 2.603 when he directed the jury to resume deliberation. Noting that the parties apparently ("I guess") were "not going to see the note," defense counsel expressed concern that it likely revealed an 11 to 1 split; that the dissenter likely was the same juror who had disagreed with the announced verdict in the poll; and that a *Crowder* instruction would be necessary to reassure her that "she doesn't have to surrender her position" because, without it, the court's directive would "signal to her" that she would "have to agree with everyone else."

The judge acknowledged that defense counsel's concern might be justified if the facts were known. Nevertheless, the judge did not offer to let the parties inspect the note to ascertain what it disclosed, nor did he disabuse defense counsel

---

[8] In his subsequent order denying appellant's motion for a new trial, see *infra*, the judge clarified that this was all that Judge Canan had told him.

of the notion that he was not allowed to see the note. Instead, the judge reasoned that because he himself intentionally had remained ignorant of what the note said or whether Juror 668 wrote it, he did not "have facts that support that she's the only one holding out" or that there was a "dramatic split." Concluding that the facts had not "changed radically," that he still lacked "actual evidence" of a likelihood of coercion, and that he would not "speculate" from "the paucity of evidence that [he] ha[d] available," the judge denied appellant's motion for a mistrial or a *Crowder* instruction. The judge then recalled the jurors to the courtroom and instructed them as follows:

> We received a note from you all before I sent you to lunch. I haven't seen that note, I don't know what it said, or who wrote the note, and that's for the following reason. Madam Clerk knows that if a note is given by the jury that in some way might demonstrate a split amongst members of the jury; 6/6, 7/5 or 11/1 or anything like that, or whether people are going towards acquittal or conviction, Madam Clerk knows that I'm not supposed to see that, and so her procedure is – or our procedure is that she's to take that to a different trial judge than myself. That's what happened. I don't know what the note said or who wrote it, so that's why I'm not responding to whatever it was that you all said. That having been said, if I could ask you all to please resume your deliberations. I just didn't want you to think that I was ignoring you. Thanks so much.

Approximately an hour later, the court received a note stating that the jury had reached a unanimous decision. In the courtroom, the foreperson announced

that the jury found appellant guilty on all counts. The jury was polled, and all twelve jurors, including Juror 668, agreed with the verdict.

Subsequently, the note that the trial judge had not read and that the parties had not seen was made available to them and included in the trial record. The note, which the courtroom clerk had received within fifteen minutes after the jury returned to deliberate following the breakdown in the jury poll, was from Juror 668 alone. "I don't feel he did it," the note stated.

In light of this revelation, appellant moved prior to sentencing for a new trial, arguing that the trial court's failure to grant a mistrial or give a *Crowder* instruction following the receipt of Juror 668's note had resulted in a verdict that likely was "tainted by coercion." The trial judge denied the motion in a written order. He reasoned that the poll breakdown did not indicate a high risk of juror coercion in continued deliberations, and that his response to Juror 668's note – informing the jury that he did not know what it said or who wrote it – ensured that the risk of coercion did not increase. The judge added that, although the note "certainly" evinced Juror 668's disagreement with verdicts of guilt, "any such apparent disagreement was resolved by the subsequent unanimous verdicts confirmed by the second poll." Accordingly, the judge ruled that appellant had

"not established an especially high risk of coercion, [or] that this court's response improperly failed to reduce any potential for coercion."

After denying the new trial motion, the court imposed sentence and appellant took this appeal.

## II.

Appellant, with the support of *amicus curiae*, challenges the manner in which the trial court responded to the breakdown in the jury poll and the subsequent communication from Juror 668. Taken together, appellant contends, the poll breakdown and the juror's note demonstrated a substantial likelihood of a coerced verdict. The trial court was obligated to take appropriate remedial action to dispel that likelihood, appellant argues, at a minimum by granting his request for a *Crowder* instruction to reassure Juror 668 that she would not be compelled to give up her honest convictions for the sake of achieving a unanimous verdict. Instead of fulfilling that obligation, appellant claims, the court erred by following a procedure that, though it was well-intentioned, was flawed in two basic respects: First, by withholding the juror's note from the parties and affording them no opportunity to be heard by the judge who read and evaluated the note and advised how to respond, the procedure denied appellant his right to be present at a critical

stage of his trial and impaired his ability to argue effectively for a proper response. Second, by keeping both judges ignorant of material information, the procedure prevented either judge from appreciating the substantial risk of juror coercion and taking the steps necessary to alleviate that risk. In fact, appellant asserts, the procedure led the trial judge not only to deny appellant's request for the appropriate relief of a *Crowder* instruction, but to instruct the jury in a fashion that exacerbated the coercive pressures on Juror 668 instead of reducing them. This, appellant contends, was reversible error. We are constrained to agree.

Trial courts are vested with discretion in determining how best to respond to poll breakdowns and communications from dissenting jurors, but a defendant is entitled as a matter of law to reversal of his conviction on appeal if the record reveals "a substantial risk of a coerced verdict."[9] We evaluate the possibility of juror coercion "from the perspective of the jurors" themselves, considering both "the inherent coercive potential of the situation before the court" and "the actions

---

[9] *Morton v. United States*, 415 A.2d 800, 802 (D.C. 1980); *see also, e.g.*, *Smith v. United States*, 542 A.2d 823, 827 (D.C. 1988) ("Whenever a claim of jury coercion is raised, we will nevertheless affirm if we can say with assurance that the jury freely and fairly arrived at a unanimous verdict. In this case we can say no such thing; coercion was probable, if not certain. Thus prejudice is presumed, and reversal is mandatory." (Internal quotation marks and citation omitted.)); *Harris v. United States*, 622 A.2d 697, 701 (D.C. 1993) ("[I]f a juror is forced to abandon an honest conviction, the resulting verdict cannot stand.").

of the trial judge in order to determine whether these actions exacerbated, alleviated or were neutral with respect to coercive potential."[10] "[O]ur evaluation of jury coercion focuses on probabilities, not certainties."[11]

Any claim of coercion "must be evaluated in context and with regard to all of the circumstances."[12] We appreciate that "the on-the-spot perception of the trial court as to the existence of coercion can provide significant input."[13] Factors that have been held to be particularly pertinent to determining the inherent coercive potential of the situation confronting the trial court in cases arising out of poll breakdowns include: (1) the degree of isolation of the dissenting juror; (2) whether the dissenting juror's identity is revealed in open court; (3) whether the jury's numerical division is revealed; and (4) whether the judge knows the dissenting juror's identity and, if so, whether the dissenting juror is aware of the judge's knowledge.[14] Whether the juror actually disagrees with the announced verdict or is

---

[10] *Id.*; *accord*, *Leake v. United States*, 77 A.3d 971, 975 (D.C. 2013).

[11] *Brown v. United States*, 59 A.3d 967, 976 (D.C. 2013) (quoting *Davis v. United States*, 669 A.2d 680, 685 (D.C. 1995)).

[12] *Harris*, 622 A.2d at 701.

[13] *Id.* at 701 n.6.

[14] *See id.* at 705; *Leake*, 77 A.3d at 976.

"merely confused about some aspect of the verdict" is also significant since, in the latter case, there is unanimity in fact and the juror would "not feel the pressure of being a dissenter in the face of majority opposition."[15] The greater the inherent coercive potential in the situation, the greater the need for the trial judge to take effective measures to dispel the risk of coercion. Pertinent factors to consider in evaluating the judge's response to a poll breakdown or jury note include (in addition to the degree of inherent coercive potential in the situation) whether the judge targeted the dissenting juror in any way, and whether the judge gave an anti-deadlock instruction urging the jury to reach agreement, a "neutral" instruction simply directing the jury to continue deliberating, or a *Crowder* instruction to counter the pressures on the dissenter to surrender honestly held convictions.[16]

---

[15] *Green v. United States*, 740 A.2d 21, 29 n.22 (D.C. 1999); *accord*, *Crowder*, 383 A.2d at 342.

[16] *See, e.g.*, *Harris*, 622 A.2d at 706-07 (holding that trial judge effectively alleviated the high potential for coercion created when the twelfth juror dissented in the jury poll, where the judge "did not give an 'anti-deadlock' instruction nor did he single the dissenting juror out in any way," and instead gave a coercion-reducing *Crowder* instruction). More generally, *Harris* identified the following questions as bearing on the evaluation of the judge's reaction:

> Did the judge make affirmative efforts to dispel any coercive potential? Did the judge take a middle course and act (or refrain from acting) in a reasonable and neutral way? Did the judge perhaps compound the problem by actions effectively adding to juror pressure?

*(continued…)*

In the present case, the jury poll broke down when Juror 668, the third juror polled, expressed unwillingness or inability to assent to the verdict announced by the foreperson. As the trial judge noted, the juror's statement was ambiguous and not clearly a dissent from the announced verdict; she might have been merely confused or momentarily reluctant to declare appellant guilty to his face. Because the trial judge immediately halted the polling, the record does not reveal whether eight of the jurors would have agreed with the verdict. To avoid pressuring Juror 668, the judge chose not to interrogate her about her answer, and he did nothing to single her out. Finding no substantial danger of juror coercion at that point, the judge neutrally instructed the jury to continue deliberating, without giving either a *Crowder* instruction or an anti-deadlock instruction. Under the circumstances, the judge handled the poll breakdown in a manner this court's past decisions have approved, and we see no abuse of discretion in his doing so.

"When dissent is revealed in open court and the jury is simply instructed to continue deliberations, '[t]he most obvious danger' is that the dissenting jurors

---

*(…continued)*

> Did the judge independently create a situation of coercive potential?

*Id.* at 705.

'will conclude that the trial judge is requiring further deliberations in order to eliminate [their] dissent.'"[17]    Nonetheless, we have recognized that poll breakdowns do not inevitably give rise to a heightened risk of coercion calling for ameliorative action by the trial judge.[18]  The degree of coercive potential often depends on when in the poll the breakdown occurs.  When the dissenting juror is not identified until the end of the poll, after all (or almost all) the other jurors have agreed with the announced verdict, we generally consider the potential for coercion in sending the jury back to deliberate further to be very high.  This is because the poll clearly identifies the juror in open court as the sole (or virtually the sole) dissenter preventing a unanimous verdict.[19]  We have held that when this occurs,

---

[17]  *Brown*, 59 A.3d at 975 (quoting *Crowder*, 383 A.2d at 342 n.11).

[18]   *See id.* at 972-74; *Green*, 740 A.2d at 29 (announcing "a baseline assumption that at least some, if not the majority, of poll breakdowns do not indicate such a high potential for undue coercion that additional instruction is required").

[19]   *See Brown*, 59 A.3d at 975 (coercive potential "especially high" where "the eleventh juror, who answered 'no,' was either completely isolated or one of two dissenters from the announced verdict"); *Harris*, 622 A.2d at 705-06 ("The situation itself had a great deal of inherent coercive potential in that there was a twelfth juror that dissented to at least part of the verdict in open court."); *Crowder*, 383 A.2d at 342 ("[W]hen a lack of unanimity is revealed in open court during the poll by the *last juror* registering a dissent, the potentially coercive impact of requiring the jury to retire for further deliberations is heightened since the numerical split of the jury and the identity of the only dissenter have been revealed in open court.").

the trial judge "must" endeavor to reduce the "atmosphere of coercion" by giving an instruction along the lines suggested in *Crowder* – specifically, "an instruction that reminds the jury that '(1) deliberations should aim toward agreement, but not at the expense of individual judgment, (2) each juror must decide the case for himself or herself, but only after impartial consideration of the views of others[,] and (3) a juror should not surrender his or her honest conviction merely to return a verdict.'"[20]  On the other hand, this court has reasoned that there is less danger of coercion and a *Crowder* instruction is unnecessary when, as here, the breakdown occurs "early in the polling" and "the positions of the remaining jurors are not revealed" – for then, we have supposed, the dissenting juror (who, realistically speaking, probably is the only dissenter[21]) is not isolated nor seemingly targeted as the lone holdout standing in the way of a unanimous verdict.[22]

---

[20]  *Brown*, 59 A.3d at 977 (quoting *Harris*, 622 A.2d at 707 n.20).  The obligatory instruction quoted by *Brown* derives from *Crowder*, 383 A.2d at 342 n.11.

[21]  *See Davis v. United States*, 669 A.2d 680, 684 (D.C. 1995).  In *Davis*, the trial court stopped the jury poll when the third juror dissented from the verdict announced by the foreperson.  This court reasoned that "[a]lthough the court did not know how the other nine jurors would have voted, we can safely infer that a minority of the jurors (and likely only one juror) were (or was) initially not in favor of the guilty verdict." *Id.*

[22]  *Leake*, 77 A.3d at 976 (finding "minimal" risk of coercion requiring *Crowder* instruction where the jury poll was aborted after the third juror dissented from the announced verdict); *see also Harris*, 622 A.2d at 703.  In *Green*, this

*(continued…)*

The situation before the court in this case changed significantly, however, when Juror 668 followed up her expressed unwillingness to assent to the announced verdict by sending a note to the judge stating "I don't feel he did it." First, the note clarified that Juror 668 actually did dissent from the verdict of guilty and was not merely confused or uncomfortable with having to tell appellant he was guilty to his face. Moreover, the fact that the note was evidently intended as a reiteration of Juror 668's publicly declared disagreement with the announced verdict indicated the relative firmness and settled nature of her dissent. The government questions this conclusion; it argues that the juror's use of the word "feel" suggests she merely found it emotionally distressing to convict appellant, not that she was dissatisfied with the sufficiency of the proof of his guilt. We are

---

*(...continued)*

court deemed the coercive potential too minimal to call for a *Crowder* instruction where it was the eighth polled juror who disagreed with the verdict. The court explained that "[t]hough it appeared that the eighth juror represented at least a minority position . . . , and perhaps was a lone holdout . . . , four other jurors had not stated their votes aloud . . . [, so] [t]his was not a situation in which the court knew the exact numerical division of the jury" or in which the dissenting juror was identified as "the sole obstacle to unanimity." 740 A.2d at 29. The *Green* court noted, however, that while a neutral directive to resume deliberations may be permissible in such circumstances, an anti-deadlock instruction would be too coercive. *See id.* at 30 (citing *Davis v. United States*, 669 A.2d 680 (D.C. 1995), and *Benlamine v. United States*, 692 A.2d 1359 (D.C. 1997), as cases in which "we have reversed convictions where a trial court, after learning through a jury poll of the existence of a minority for acquittal, subsequently gave the anti-deadlock *Winters* charge").

not persuaded by this argument. As amicus points out, "I feel" is commonly used and accepted in ordinary speech as a synonym for "I think" or "I believe," and "I don't feel he did it" thus is readily understood as equivalent to "I don't think [or believe] he did it." It strikes us as implausible on its face that Juror 668 wrote her note to the judge only to express an emotional, or irrational, aversion to finding appellant guilty in spite of the evidence. In our view, the natural and by far the most likely interpretation of the note is that it stated the juror's belief in appellant's innocence based on her assessment of the evidence.

Second, the note tended to dispel some of the ambiguity of the abortive jury poll in another important respect: When the jury was polled, Juror 668 was exposed in open court as likely being the only dissenter from the announced verdict of guilty, but the poll breakdown by itself left the precise numerical division of the jury unrevealed. Because the follow-up note was from Juror 668 alone and spoke only of *her* belief in appellant's innocence, it was a strong indication of her isolation in a jury that was firmly 11 to 1 for conviction. It is unlikely that Juror 668 would have sent such a note after the judge instructed her and the rest of the jury to continue deliberating if any other jurors had been in agreement with her, or if she had not perceived the jury to be at an impasse and herself to be under pressure to cave in and conform to the will of the super-

majority. Rather, the note suggests Juror 668's quandary and, perhaps, uncertainty about her options in those circumstances.[23]

Thus, Juror 668's note to the judge distinguishes this case from the ordinary case in which the judge aborts jury polling after the third juror indicates disagreement with the verdict because the information in the note all but confirmed that the juror was alone in her convictions and provided evidence that the juror felt pressured to surrender those convictions by the instruction to continue deliberations. Although our case law presumes that the risk of coercion is not substantial in the former situation, we cannot indulge that presumption here in the face of a juror's repeated statement (both during the polling and in the note) to the court regarding her stance on the verdict. Because these facts are comparable to if not worse than the state of affairs when a jury poll conclusively singles out a solitary dissenter in open court, the "inherent coercive potential" in the situation confronting Juror 668 was especially high. Therefore, under our cases, the risk of

---

[23] *Cf. Brown*, 59 A.3d at 975-76 ("[F]or the juror exposed in open court as a dissenter from an announced unanimous verdict, the pressure to conform is real when the judge requires further deliberations with virtually unanimous jurors of a contrary mind – *unless* the judge assures the dissenter, indeed all jurors, that none should surrender honest conviction and that each is free to change his or her mind. . . . Without a clearer, more specific instruction, the other jurors, not just the announced dissenter, may be unsure about what options are open to them if the dissenter stands pat.").

juror coercion was great enough to necessitate more than a merely neutral response from the trial judge instructing the jury to continue deliberating. It required an affirmative effort by the judge, such as the *Crowder* instruction appellant requested, to dispel the risk that such a directive would culminate in a coerced verdict.

After receiving Juror 668's note, however, the trial judge informed the jury only that he did not know who wrote it or what it said, and that he was not going to respond to it, because the courtroom clerk had withheld the note from him so that he would not learn how the jury was split. The limited purpose of this non-response to the note was to avoid inadvertently pressuring jurors in the minority to change their votes; for "[i]f the jury reasonably believes that the judge knows how it is divided, regardless of the judge's actual knowledge, *any* pressure by the judge to reach a verdict . . . will be understood by all jurors to be directed at the minority."[24] But while the instruction may have avoided that pitfall, it did not go far enough because it did nothing to reduce the pressure Juror 668 likely felt as the lone holdout to surrender her conscientious scruples to reach a unanimous verdict. Instead, it appears likely that Juror 668 would have understood the judge's non-

---

[24] *Smith v. United States*, 542 A.2d 823, 825 (D.C. 1988).

response to her note as a refusal to address her difficulty and provide her with any guidance at all – exacerbating rather than reducing the risk of a coerced verdict by seeming to leave her no alternative to capitulation.[25] To relieve the substantial risk of coercion, the judge should have given the requested *Crowder* instruction as well. Such an instruction, we note, would have been fully compatible with the rest of the judge's response to the note.[26]

Of course, the judge did not give a *Crowder* instruction because he was kept from acquiring actual knowledge of the facts that gave rise to the need for it. Ironically, the very procedure the trial judge followed to avoid learning what he should not have learned – how the jury was divided (or any juror's views on the issues) – prevented the court from learning what it needed to learn – that it was confronted with a situation with high inherent coercive potential and a substantial likelihood of a coerced verdict. It was not inappropriate for the trial judge to

---

[25] The fact that the jury returned a unanimous guilty verdict within only an hour after the judge's statement that he did not intend to read the note may be taken as tending to confirm the impression that the judge's unresponsive directive did nothing to alleviate and may well have increased the potential for coercion of Juror 668.

[26] The record does not make clear why the judge was averse to giving a *Crowder* instruction even though he had acknowledged the possibility of juror coercion under the circumstances.

insulate himself from knowledge of the jury's division by having a second judge read the note and advise him as to the appropriate course of action. The procedure utilized to accomplish that was flawed, however – not, perhaps, in its conception, but in its execution.

First, "[a]lthough the trial judge may have chosen to insulate himself from knowledge of the jury's numerical division, it was error to insulate defense counsel as well."[27] The trial court plainly erred by withholding Juror 668's note from appellant; that was a clear violation of our cases interpreting a criminal defendant's right to be present at every stage of his trial.[28] The error affected appellant's substantial rights and the fairness of his trial because his ignorance of the note's content and author impaired his ability to argue effectively for a *Crowder* instruction to alleviate the coercive pressure on Juror 668 to surrender her honest

---

[27] *Smith*, 542 A.2d at 827.

[28] *See id.* at 826 ("The trial judge in the case at bar committed an additional error in refusing to allow defense counsel to read either note. . . . [This] kept from counsel the critical knowledge that each note revealed a lopsided numerical split favoring a guilty verdict. We have repeatedly held that a defendant and his counsel have a right to be informed of all communications from the jury and to offer their reactions before the trial judge undertakes to respond. The source of this right is Super. Ct. Crim. R. 43, which entitles the defendant to be present at every stage of the trial." (Citations, punctuation, and footnote omitted.)); *see also Foster v. George Washington Univ. Med. Ctr.*, 738 A.2d 791, 796-97 (D.C. 1999).

conviction of appellant's innocence (or for the necessity of other relief, i.e., a mistrial). Even if the trial judge needed to be shielded from knowing who wrote the note and what it said, appellant could and should have been allowed to bring that information and its significance to the attention of the judge who read and evaluated the note and who advised the trial judge how to respond to it. That consulting judge was, in effect, a second decision-maker in this case, and his involvement in the decision therefore implicated appellant's right to be present at every stage of his trial.

Second, in large part as a result of the parties' ignorance of the note's content and their lack of an opportunity to address the judge who read the note, neither judge was aware of the material facts showing that a heightened risk of coercion was present. The trial judge, as he essentially admitted to counsel, could not evaluate the inherent coercive potential of the situation or fashion an appropriate response without knowing what the note said or even who wrote it. The judge who read the note also was at a disadvantage; he lacked the contextual information needed to appreciate the note's significance and render apt advice on how the trial judge should respond to it, as he had not been present during the poll breakdown and could not know (the trial judge could not have told him) that the juror who wrote the note had dissented in the poll. As far as the record indicates,

the judge may not even have known there had been a poll breakdown. There is no indication that the judge even considered whether a *Crowder* instruction (or a mistrial) would be necessary or appropriate.[29]

The upshot is this: the flaws in the procedure led to a decision denying appellant's request for a *Crowder* instruction that was made in derogation of appellant's rights and in ignorance of the material facts. The trial court exercised its discretion erroneously by failing to make "[a]n informed choice among the alternatives . . . based upon and drawn from a firm factual foundation."[30] In view of the substantial risk of juror coercion that confronted the court, and that was not effectively addressed, we cannot find the errors to have been harmless. Appellant is entitled to a new trial.

*Reversed and remanded.*

---

[29] Because the consultation between the two judges was off the record, neither we nor the parties know exactly what information was exchanged in that consultation.

[30] *Johnson v. United States*, 398 A.2d 354, 364 (D.C. 1979).